UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE W. BRUCE, | ) |
| Plaintiff, | )<br>)<br>) |
| v. | )<br>) Case No. 10-cv-1519 |
| BOARD OF EDUCATION OF THE<br>CITY OF CHICAGO,<br>CHICAGO PUBLIC SCHOOLS, and<br>CAREDA TAYLOR, | )<br>) Judge John W. Darrah<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff George W. Bruce was formerly employed as the School Operations Manager at Percy L. Julian High School ("Julian") until May 6, 2009, when his position was redefined and his employment was terminated. Bruce brought this action against his former employer, Julian Principal Careda Taylor, and the Board of Education of the City of Chicago and Chicago Public Schools. He states two claims for relief. Count I is a claim that Defendants violated his right to due process under the United States Constitution. Count II is a claim that his termination was in violation of Illinois state law.

Both parties filed motions for summary judgment. Defendants move for judgment on both counts. Bruce moves for judgment on Count I only. For the reasons discussed below, Bruce's motion is denied, Defendants' motion is granted as to Count I only, and Count II is dismissed.

## BACKGROUND

The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[1]

In June 2001, George W. Bruce was hired as the Business Manager at Julian High School, which is part of the Chicago Public School System. (Pl. SOF ¶ 5.) In July 2001, Julian's principal, Dr. William Harris, with the approval of the Local School Council, changed Bruce's position to Operations Manager.[2] (*Id.*) Bruce was hired as a full time, school-based, educational support personnel employee. (*Id.* ¶ 6.)

Under Illinois law, each school is required to have a School Improvement Plan for Advancing Academic Achievement ("SIPAAA"). (Def. SOF ¶ 2.) The SIPAAA is a document that outlines the programs, classes, and expenditures of the school. (*Id.*) It does not take effect until it is approved by the Local School Council. (Pl. SOF ¶ 13; Pl. SOF ¶ 10.)

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). Those statements are cited throughout this Opinion as "Pl. SOF ¶ __" and "Def. SOF ¶ __," respectively. Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. Those statements of additional facts are cited herein as "Pl. SOAF ¶ __" and "Def. SOAF ¶ __," respectively. A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

[2] Local school councils are created by Illinois law and are comprised of members elected by the "parents and community residents for the attendance center." *See* 105 ILCS 5/34-2.1. The powers and duties of the local school councils are set forth at 105 ILCS 5/34-2.3. A local school council's authority is in partnership with that of the school principal, an Area Instructional Officer, and the Board of Education. (Def. Resp. to Pl. SOF ¶ 10.)

Bruce's duties as School Operations Manager included assisting in the planning and development of the SIPAAA, monitoring school performance, managing the school budget and accounts, monitoring compliance with school vendors, grant application and preparation, overseeing the food services and physical plant and facilities, overall management of school safety and security operations, and other duties as determined by the principal. (Def. SOF ¶ 2.) Essentially, the position of School Operations Manager consisted of all of the duties of a School Business Manager (the position for which Bruce was initially hired) but with additional duties and responsibilities. (Pl. SOF ¶ 9.) Thus, any person qualified to be an Operations Manager would be qualified to be a Business Manager. (*Id.*)

Bruce was not the beneficiary of any collective-bargaining agreement or express written employment contract. (Def. SOF ¶ 3.) Defendants argue that Bruce therefore was an "at-will" employee. (Def. SOF ¶ 3.) The definitional section of the Board's Employee Discipline and Due Process Policy states:

> At-will employees have no property interest in their employment or expectation of continued employment. At-will employees may be discharged from employment with or without cause and with or without notice.

(Def. SOAF ¶ 2.) If the position of an "at-will" employee is redefined, and a new position is opened, the employee would have no right to the new position as a "back-to-back" position without some collective-bargaining agreement benefit. (Def SOF ¶ 5.) The "at-will" employee would be free to apply for an open position the same as any other qualified employee, but he would have no seniority right to any new position by virtue of any previous time employed by the Board. (*Id.*)

Bruce's position as School Operations Manager was funded by the State of Illinois through State Title I funds. (*Id.* ¶ 9.) These funds are discretionary funds that each principal may allocate as needed in accordance with the school's SIPAAA. (*Id.*) Spending of these funds must be approved by the Local School Counsel. (Pl. Resp. to Def. SOF ¶ 9.) Julian's SIPAAA for 2008 to 2010 was approved by unanimous vote of the Local School Council and signed by the council's chairman, Larry McDonald. (Pl. SOF ¶ 17.) This plan included the State Title I funding for Bruce's School Operations Manager position. (Def. SOF ¶ 9.)

*Bruce's Termination*

Dr. Harris retired as principal and was replaced by Therese Johnson, who served as Julian's interim principal for about seven months. (Pl. SOF ¶ 18.) The Local School Council then selected Dr. Darryel Young-Gibson as Julian's new contract principal. (*Id.*) On March 24, 2009, Julian was placed on probation by the Illinois State Board of Education. (Def. SOF ¶ 11.) In April of 2009, Dr. Young-Gibson was removed and replaced by Careda Taylor. (*Id.*)

On April 13, 2009, Taylor prepared an amendment to the SIPAAA, redefining several positions, including Bruce's, and changing other planned and approved expenditures. (Def. SOF ¶ 15.) Taylor submitted the amendment to her supervisor, Area Instruction Officer Jerryelyn Jones, who approved the amendments on April 17, 2009. (*Id.*) Taylor informed the Local School Council that she was redefining Bruce's position, but the Council never approved this change as an amendment to the SIPAAA. (Pl. SOF ¶ 17.) McDonald refused to sign the paperwork because the Council

4

had not been given a chance to consider the issue and the community had not been given notice. (*Id.* ¶ 23.) However, Area Instruction Officer Jones testified that if a school is on probation – Julian was – approval of the LSC is not required to amend the SIPAAA. (Def. Resp. to Pl. SOF ¶ 15.)

On April 17, 2009, Taylor told Bruce she was closing and redefining his position to create a new Business Manager position. (Pl. SOF ¶ 20.) Bruce told Taylor that he wanted to be considered for the Business Manager position, and Taylor responded that he should "move on." (Pl. SOF ¶ 21.) Taylor told Bruce to continue to work at Julian until he received his "letter from downtown." (*Id.*) On or about April 23, 2009, Bruce received a letter from the Department of Human Resources of the Chicago Public Schools, officially terminating his employment. (*Id.*) As a result, Bruce's last day of work was April 27, 2009. (*Id.*) The letter from the Board's Department of Human Resources advised him that his position was no longer available as of May 6, 2009, due to budget reductions, restructuring, reorganization, or elimination of a program, and that he was eligible to apply for any other vacancies for which he qualified anywhere in the Board. (Def. Resp. to Pl. SOF ¶ 21.) Bruce received a salary through May 16, 2009. (*Id.*) He did not receive a hearing or notice that he was being terminated for cause. (Pl. SOF ¶ 35.)

On May 1, 2009, Taylor received an email from Gerod Sherley, Academic Assessment Support Director, complimenting Bruce:

> I heard about George Bruce. He is a good Business Manager. He knows the school accounts well. I've worked with him before when Therese Johnson was interim. He can be very helpful for you.

(Pl. SOF ¶ 22.) Taylor responded with criticism:

> I cannot tell you how out of whack this budget was. The internal accounts are depleted as a result of some very poor decisions. . . . When I came there was a huge amount of money sitting in the rollover. All the buckets were in negative because there was [sic] no controls.—Well many. So I believe that this [sic] because a political hotbed for Mr. Bruce between the LSC and the principals. . . . I know him from my last visit here but this was and is too far gone. . . . He knows that he can apply for the new position but it will not be an Operations Manager because that level of service was not being rendered here. I kid you not.

(Id.)

Taylor testified that because she had three assistant principals and a treasurer, she did not need a School Operations Manager as well. (Def. SOF ¶ 14.) The new Business Manager position would be responsible only for the financial accounts and expenditures of Julian and would not have the other School Operations Manager duties, which were duplicative of duties handled by other administrators already at Julian. (Id.)

As Operations Manager, Bruce's salary was approximately $97,000 per year; with benefits, his position cost the Board a total of $131,000 per year. (Id. ¶ 18.) With the exception of the principal and assistant principals, Bruce was the highest paid educational support person at Julian. (Id.) Bruce admits that if a principal believes that spending more than $100,000 on an Operations Manager position is duplicative given the operational responsibilities of the principal and assistant principals, it is appropriate for her to recommend to her superiors that the Operations Manager position be closed or re-defined. (Id. ¶ 19.)

*Bruce's Replacement*

On June 10, 2009, pursuant to Board procedures, Taylor posted a job opening for the new Business Manager position. (Pl. SOF ¶ 30.) Thirty-six applications were received by the Department of Human Resources (Def. SOF ¶ 17), and Taylor interviewed three or four people for the position (Pl. SOF ¶ 30) – Bruce did not submit an application (Def. SOF ¶ 17). However, on May 21, 2009 – more than two weeks before posting the opening – Taylor had already completed paperwork to fill the Business Manager position, effective July 1, 2009, with Ranakea Donaldson, who was present and working at Julian up to eight times in order to assist Taylor with getting Julian's accounts in order before she was hired. (*Id.* ¶ 28; Def. Resp. to Pl. SOF ¶ 27.)

Ultimately, the Board of Education makes final decisions regarding the hiring and staffing of employees. (Def. SOAF ¶ 28.) Once the Referral form is completed, it goes to Human Resources to officially hire an employee. (Pl. SOF ¶ 29.)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food*

*Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

### *Count I – Due Process*

The crux of this dispute regarding Bruce's due-process claim is whether Bruce had a property interest in his continued employment at Julian such that his termination on short notice, without a hearing and without the tendering of the redefined Business Manager position, violated his right to due process.

The Due Process Clause of the Fourteenth Amendment forbids a state from depriving any person of life, liberty, or property without due process of law. A procedural-due-process claim requires a two-part analysis: first, whether the plaintiff has

been deprived of a protected property right and, second, what process is due in order to protect that right. *Townsend v. Vallas*, 256 F.3d 661, 674 (7th Cir. 2001). "[T]he threshold question is whether a property interest actually exists." *Buttita v. City of Chicago*, 803 F. Supp. 213, 218 (N.D. Ill. 1992). Property interests are not created by the Constitution; rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

In the employment context, property interests arise in two ways: by an "independent source such as state law securing certain benefits" or by a "clearly implied promise of continued employment." *Heck v. City of Freeport*, 985 F.2d 305, 310 (1993) (quoting *Shlay v. Montgomery*, 802 F.2d 918 (7th Cir. 1986)). Bruce identifies two purported sources of a property interest in his position at Julian: The Chicago Board of Education's Employee Due Process and Discipline Policy (the "Policy") and the Illinois School Code.

Regarding the Policy, Defendants argue that Bruce was an "at-will" employee and that the Policy expressly provides that at-will employees can be terminated with or without notice and with or without cause. "At-will" employees are defined in the Policy as follows:

> At-will employees include, but are not limited to, supervisors, managers, confidential employees, probationary employees, interim, acting or associate principals, interim employees, the Chief Executive Officer, Chief Officers, heads of general departments now in existence or hereafter created, the General Counsel, and all assistant attorneys. At-will employees have no property interest in their employment or expectation of continued employment. At-will employees may be discharged from employment with or without cause and with or without notice.

9

(Ex. E to Def. 56.1 (Policy), at ¶ Ill.3.)

The presumption in Illinois is that employees are employed "at will." *Rujawicz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009). Bruce admits he is not the beneficiary of any collective-bargaining agreement or express written employment contract. Instead, he asserts that his position does not fall within the broad definition of "at-will employees" by pointing to another definition in the Policy, which describes "educational support personnel." Although there is no dispute that Bruce's position was classified as educational support personnel, the two definitions are not mutually exclusive. For example, the category of "probationary employees" is both defined separately (*see* Policy ¶ III.11) and expressly included in the definition of "at-will" employees (*see id.* ¶ III.3). Nothing in the Policy provides that educational support personnel are not at-will employees.

The Policy does, however, provide a process to be followed when educational support personnel are disciplined or discharged for cause. Bruce argues that Taylor's email to Gerod Shirley, in which Taylor expressed concern regarding Julian's finances, is evidence that Bruce was, in fact, discharged for cause. Therefore, argues Bruce, he was entitled to the disciplinary procedures set forth in the Policy. At most, Taylor's email provides some evidence that Taylor was dissatisfied with Bruce's job performance; it does not support Bruce's claim that the reason provided by the Board of Education – that Bruce was terminated due to budget reductions, restructuring, or reorganization – was not the true reason for his termination. And the fact that a procedure exists regarding the

discipline of educational support personnel does not mean that any particular process is due those employees when their position is redefined for staffing and budget purposes.

Furthermore, even if Bruce was entitled to certain disciplinary procedures set forth in the Policy (if the true reason behind Bruce's termination was Taylor's belief that his performance was such that he should be subject to discipline), it does not follow that he was *constitutionally* entitled to those procedures. It is well settled that a violation of state law or procedural rules is not a constitutional due-process violation. *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) (*Osteen*).

In *Osteen*, Thomas Osteen was expelled from a university for fighting with another student. *Id.* at 224. Osteen brought suit, claiming in part that the defendants' failure to comply with the requirements of the student judicial code deprived him of property without due process of law, in violation of the Fourteenth Amendment. *Id.* at 225. On appeal, the Seventh Circuit held that claim meritless, stating: "As we tirelessly but unavailingly remind counsel in this court, a violation of state law (for purposes of this case the student judicial code may be treated as a state law) is not a denial of due process, even if the state law confers a procedural right." *Id.*

The Seventh Circuit reached a similar conclusion in *Campbell v. City of Champaign*, 940 F.2d 1111 (7th Cir. 1991) (*Campbell*). In that case, a municipal records manager was fired for being rude to fellow employees. *Id.* at 1111. She claimed her termination was in violation of the progressive-discipline procedures provided for in her employee handbook and brought an action under § 1983, claiming she was fired without due process. *Id.* at 1111-12. After noting that a city ordinance provided that the

records manager "shall serve at the pleasure of the City Manager," the court of appeals held that the plaintiff's employee handbook did not create an employment contract. *Id.* The court rejected the plaintiff's argument that, by listing various grounds for dismissal in the handbook, the City intended to imply that its employees could not be terminated for any other reason. *Id.* at 1112. But the court went further, holding that, even if the plaintiff had a valid claim for breach of contract, it would not follow that she had a due-process claim. *Id.* at 1113. "When the claimed deprivation of property is the loss of a job, the entitlement must be to a job, rather than just to a set of disciplinary procedures." *Id.*

Here, Bruce's claim is similarly infirm. Like the plaintiff in *Campbell*, Bruce merely claims an entitlement to certain procedures; he does not identify any provision in the Policy that entitles him to the job itself. Bruce fails to identify any evidence to support his contention that he was not an at-will employee and, consequently, no evidence that the Policy provided him with any protected interest in his job.

Bruce also argues that Illinois law provides him with a protected property interest in his continued employment due to the manner in which his position was funded. Bruce's position was funded by State Title I funds, which can only be spent with the budgetary approval of the Local School Council. *See* 105 ILCS 5/34-2.3.d.1. The funding of Bruce's position was part of Julian's SIPAAA. Once an SIPAAA is approved by a local school council, the principal is charged with directing its implementation, and the local school council is charged with monitoring its implementation. 105 ILCS 5/34-

2.4. Bruce argues that by deciding to redefine his position and spend that money on Bruce's replacement, Defendants violated the law.

The parties dispute whether the Illinois School Code permitted Taylor to amend a plan as part of her duty to "implement" it. They also dispute whether the Board of Education had a separate, lawful procedure in place for schools, such as Julian, that were on probation. Defendants assert that amendments to SIPAAAs for schools on probation had to be approved only by the Area Instruction Officer, rather than by the Local School Council. At best, this dispute regarding the proper procedure for amending SIPAAAs indicates that Taylor and the Board of Education may have overstepped their authority with the Local School Council; it does not create a genuine issue of material fact regarding whether Bruce had a protected property right in his employment. Nothing identified in Article 34 of the School Code indicates that the legislature intended to confer a property right on employees whose positions are funded with State Title I funds.

Bruce's final argument is that a separate provision in the School Code creates a protectable interest in the continued employment of all educational support personnel in districts governed by boards of education. Pursuant to Illinois law, educational support personnel employees who are dismissed or removed by a school board are entitled to at least 30 days' written notice and a statement of honorable dismissal. *See* 105 ILCS 5/10-23.5. Additionally, "[i]f the board has any vacancies for the following school term or within one calendar year from the beginning of the following school term, the positions thereby becoming available within a specific category of position shall be tendered to the employees so removed or dismissed from that category of position, so far

as they are qualified to hold such positions." *Id.* Defendants argue that this section of the Illinois School Code is inapplicable to the Chicago Board of Education and that, at any rate, Section 23.5 is merely a procedural rule, not a grant of a property right in educational support personnel positions.

As explained above, a violation of state or local procedure is not a denial of constitutional due process. *See Osteen*, 13 F.3d at 224. Here, Bruce was terminated on less than 30 days' notice and was not tendered his redefined position after he was terminated. Even if his termination was in violation of the procedures set forth in Section 23.5, it does not follow that the Illinois legislature (through Section 23.5) intended to confer Bruce with a property interest in his job as an educational support personnel employee. Thus, Bruce's due-process claim fails as a matter of law, and Defendants are entitled to judgment on Count I of Bruce's Complaint.

*Count II – State-Law Claim*

Bruce also asserts a state-law claim based on Defendants' alleged violation of 105 ILCS 5/10- 23.5. He seeks relief for the income and benefits lost and the emotional distress and mental anguish he suffered. As stated above, Defendants argue that Section 23.5 is not applicable to the Chicago Board of Education. They further argue that Bruce's state-law claim does not involve any novel issues of law that warrant deferral to the state court and that addressing Bruce's state-law claim would be an appropriate exercise of this Court's supplemental jurisdiction. Accordingly, Defendants move for summary judgment on Count II, as well.

As discussed above, Illinois law provides that educational support personnel employees who are dismissed or removed by a school board are entitled to at least 30 days' written notice, a statement of honorable dismissal, and the tendering of any available open positions within the same category. *See* 105 ILCS 5/10-23.5.

Section 23.5 is contained in Article 10 of the School Code, which is entitled "School Boards." Nothing in the text of Section 23.5 expressly excludes the Chicago Board of Education or any other school board within the State of Illinois. Rather, the statute simply refers generically to "the board" or "the school board." As used throughout the School Code, "school board" means "the governing body of any district created or operated under authority of this Act, including board of school directors and board of education." 105 ILCS 5/1-3.

As Defendants note, however, Section 23.5 is an enumerated power of "boards of education." *See* 105 ILCS 5/10-23 ("Boards of education have the additional powers enumerated in Sections 10-23.1 through 10-23.12."). Unlike the term "school board," "board of education" is not defined at the beginning of the School Code. Defendants nonetheless argue that "boards of education" in this context should be interpreted in a manner that excludes the Chicago Board of Education. They do so by representing that Section 10 of Article 10 provides a definition for "boards of education" as used throughout Article 10. That provision begins as follows:

> All school districts having a population of not fewer than 1,000 and not more than 500,000 inhabitants,[3] as ascertained by any special or general census, and not governed by special Acts, shall be governed by a board of

---

[3] The Chicago Public School District is the only district in the state with more than 500,000 inhabitants.

education consisting of 7 members, serving without compensation except as herein provided.

105 ILCS 5/10-10. Section 10 goes on to describe the terms of board members and the procedures for elections and filling vacancies. *See id.* It does not, however, purport to be a definition of the term "board of education," and it does not in any way indicate that the entirety of Article 10 is inapplicable to the Chicago Board of Education.

The use of the term "board of education" throughout the School Code is, at times, imprecise; and there appears to be no Illinois case law on point to resolve this question of whether the legislature intended to exclude the Chicago Board of Education from Section 23.5.[4] Throughout the School Code, the terms "school board" and "boards of education" are at times used interchangeably and other times used distinctively. On some occasions, "Board of Education" is capitalized. *See, e.g.*, 105 ILCS 13-41 (providing for a "Board of Education" for the Department of Juvenile Justice School District). But generally, it is not – even in instances where it is clearly intended to be a defined term. *See, e.g.*, 105 ICLS 5/34-1 (providing that "board of education" when used in Article 34 refers to the Chicago Board of Education).

Some chapters within Article 10 explicitly include cities with over 500,000 inhabitants, which would support a presumption that they are not otherwise included.

---

[4] Defendants argue that the issue has been resolved in *People ex rel. Sackmann v. Keechler*, 194 Ill. 235, 244 (1901) (*Sackmann*), a 1901 Illinois Supreme Court case. Contrary to Defendants' representations, that case did not at all address Section 23.5. It merely states that Article 3, Section 59 and Article 6, Section 2 – *Sackmann* predates the current School Code – must be construed together, so that when a new district is formed which has a population of not less than 1,000 and not over 100,000, election must be for a board of education, instead of three directors. The *Sackmann* court did not address Section 23.5 (or a predecessor statute).

*See, e.g.*, 105 ILCS 5/10-22.6. Others explicitly *exclude* cities with over 500,000 inhabitants, which would support a presumption that they *are* otherwise included. *See, e.g.*, 105 ILCS 5/10-17. Indeed, the provision at issue in this case contains express language exempting Chicago Public Schools from only a *portion* of Section 23.5's requirements. Section 23.5 contains two paragraphs. The first paragraph provides that boards of education shall have the power to employ such educational support personnel employees "provided that residency within any school district shall not be considered in determining the employment or the compensation of any such employee, or whether to retain, promote, assign or transfer such employee." 105 ILCS 5/10-23.5. That paragraph continues on to include the aforementioned provisions regarding notice, honorable dismissal, and the tendering of open positions. *See id.* The second paragraph then states, in its entirety: "The provisions of this amendatory Act of 1986 relating to residency within any school district shall not apply to cities having a population exceeding 500,000 inhabitants." 105 ILCS 5/10-23.5. If the legislature intended for "board of education," as used in Sections 23 *et seq.*, to exclude the Chicago Public School District, then what is the purpose of the express exemption regarding residency requirements set forth in Section 23.5?

On the other hand, Defendants' argument that Article 10 does not apply to the Chicago Board of Education is bolstered by the fact that some of Article 34's provisions duplicate those set forth in Article 10. Indeed, some provisions within Article 34 are nearly identical to provisions set forth in Article 10. *Compare, e.g.*, 105 ILCS 5/34-18.14 (providing legislative findings regarding the use of cell phones in schools and providing

17

that the "school board" may establish rules and disciplinary procedures governing the possession of cell phones on school property), *with* 105 ILCS 5/10-20-28 (same). If the powers of boards of education set forth in Article 10 also apply to the Chicago Public Schools, what is the purpose of the seemingly redundant provisions in Article 34?

The persuasive contrary interpretations of the statute demonstrate that the issue is not one that is easily decided and that the resolution of this question regarding the interpretation of an Illinois statute is better left to Illinois courts. A district court may decline to exercise supplemental jurisdiction over any other claim if it has dismissed claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Because Bruce's federal claims have been completely disposed of on summary judgment, the Court declines to exercise supplemental jurisdiction over Bruce's state-law claim. Count II is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Bruce's Motion for Summary Judgment is denied in its entirety, Defendants' Motion for Summary Judgment is granted as to Count I and denied as to Count II, and Count II is dismissed without prejudice.

Date: August 31, 2011

JOHN W. DARRAH
United States District Court Judge